952 F.2d 1567
 Durham Eldon STOKES, Petitioner -Appellant,
v.
Harry K. SINGLETARY, Jr., Florida Department of Corrections;
and Robert A. Butterworth, Attorney General,
State of Florida, Respondents-Appellees.
 Nos. 89-3180, 89-3493.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 27, 1992.
 
 Thomas C. MacDonald, Jr., Tampa, Fla. (court appointed), for petitioner-appellant.
 Margene A. Roper, Belle B. Turner, Asst. Attys. Gen., Daytona Beach, Fla., for respondents-appellees.
 Appeals from the United States District Court for the Middle District of Florida.
 Before COX and BIRCH, Circuit Judges, and GIBSON*, Senior Circuit Judge.
 BIRCH, Circuit Judge:
 
 
 1
 This habeas corpus petition requires examination of an inculpatory confession taken without the presence of counsel after counsel had been appointed, and admitted into evidence at the trial resulting in petitioner's conviction. Approving the magistrate's report and recommendation, the district court determined that petitioner knowingly and voluntarily waived his right to counsel prior to his confession, and that his confession was not the result of psychological coercion. Our review of the record reveals factual, procedural and constitutional problems. The state and federal courts heretofore have not explained their resolution of the factual disputes, supplemented the inadequate record or analyzed this case under the appropriate constitutional law. Accordingly, we reverse and remand, directing the district court to conduct an evidentiary hearing and to analyze thoroughly in a written order the consequent legal conclusions based on its factual findings.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 On June 8, 1974, petitioner-appellant Durham Eldon Stokes attended a beer party given by his motorcycle gang, known as the Outlaws Motorcycle Gang (Outlaws), at their meeting place in Orlando, Florida. William T. Kish, Richard L. Farless and Steven Almond, members of a rival motorcycle group, the Pagans, were invited. Subsequently, the three Pagans were beaten, kicked, bound, and had their valuables taken by some of the Outlaws.
 
 
 3
 Following the severe beatings, Stokes and two other Outlaws members were ordered to place Kish, Farless and Almond in a van and to transport them from Orange County, Florida for burial. In the course of the trip, Almond kicked open the side door of the van and fell onto the Florida turnpike. A passing motorist took Almond to a highway patrol station, where he reported the incident. Stokes and the other two Outlaws continued to drive to an isolated area, where they left Kish and Farless away from the highway. Thereafter, Stokes disassociated himself from the Outlaws and lived with his wife and children in Arkansas from June, 1974, until December, 1977.
 
 
 4
 On December 7, 1977, a hunter in rural Sumter County, Florida, discovered two male skeletons. Through medical and dental records, these remains were identified as Kish and Farless. Based on an Orange County, Florida information,[1] Stokes was arrested in Arkansas on December 16, 1977, transported to Florida, and arrived in Orange County on December 21, 1977.
 
 
 5
 On December, 22, 1977, Stokes had his initial appearance in the state trial court. The trial judge appointed the public defender to represent Stokes, who was given a card with the information necessary for him to contact his attorney.[2] Immediately upon Stokes's return to his cell following his initial appearance, Lieutenant Jim Roop and Sergeant William M. Hager of the Sumter County Sheriff's Department, the investigating officers for the case, had him taken to an interrogation room where they questioned him. Neither officer informed the public defender's office that they intended to interrogate Stokes.
 
 
 6
 Portions of the interview of Stokes were taped and transcribed. After Stokes was read his Miranda rights, he described his knowledge of and participation in the incident involving the three Pagans. His involvement prior to the van transportation of Kish, Farless and Almond was to kick one of them, but he could not recall whom. Thereafter, Stokes, who admitted that he was drunk and had taken drugs, was told to station himself outside the enclosed area where the beatings occurred. He stated that he did not participate in the beatings or in taking valuables from the three men. Following the beatings, Stokes, who did not want to transport the Pagans, was ordered by the Outlaws leader to ride in the van. Stokes was not told to kill the Pagans and he did not hear anyone else ordered to do so. No additional beatings occurred in the van.
 
 
 7
 When Almond exited the van, Stokes stated that Kish and Farless were still alive. By the time the three Outlaws drove to an isolated area to deposit Kish and Farless, these men had stopped breathing. Stokes stated that he refused to check Kish and Farless to ensure that they were dead. Stokes never signed his statement, and it is not notarized.
 
 
 8
 On May 18, 1978, a Florida grand jury indicted Stokes for the first-degree murders of Kish and Farless. Stokes's attorney moved to suppress his statement because Stokes was not afforded the opportunity to consult with his counsel prior to the taking of his statement, his attorney was not present when he made his statement, and the statement was obtained by coercion through implied threats. The state trial court conducted a hearing on the motion to suppress.
 
 
 9
 At the suppression hearing, Stokes testified that, upon being taken into the interrogation room, the "[f]irst statement I made I told them I wanted to talk to a lawyer about anything I said in their presence," and he "started to get up" to leave the room. R1-14-App.-8, 15. Stokes testified that the officers told him that, if he gave them a statement, then they would protect him and his family because the Outlaws had a contract on Stokes's life. Having known Roop since high school, Stokes trusted him. Stokes testified that he requested a lawyer more than once before the officers began to record the interview, the transcript of which evidences Miranda warnings. Although Stokes testified that he wanted to talk to his lawyer, he allowed the interview because "I was scared that if I didn't go along with them that possibly--I wasn't too much worried about myself. I was worried about my family."[3] Id. at 10. Stokes testified that he would not have given the statement if the officers had not mentioned possible retribution by the Outlaws to his family.
 
 
 10
 Although Sergeant Hager testified at the suppression hearing that Stokes did not request his counsel's presence before he made his statement, Hager did concede that he talked with Stokes for five to ten minutes before the tape recorder was activated and, that, during this time, Stokes expressed concern for his family. Hager testified that he had been in communication with a man who was concerned about the safety of the Stokes family and was interested in making arrangements to secure them. Hager stated that he communicated this information to Stokes during their conversation before the tape recorder was activated.
 
 
 11
 Hager testified that he knew that Stokes was brought to the interrogation room directly from his initial appearance, and yet he did not ask Stokes if he had or wanted an attorney. Additionally, Hager did not inform the Orange County State Attorney's Office that he intended to question Stokes. Although there was no subsequent written ruling by the state trial court on Stokes's suppression motion, his statement was entered into evidence and played for the jury at his trial, which commenced on August 8, 1978.[4]
 
 
 12
 The excerpts from the trial transcript in the record contain the testimony of one of the officers who interrogated Stokes following his initial appearance.[5] The officer concedes that not only did the officers converse with Stokes before the taping began, but also that a portion of the interrogation was not taped because the tape had not been turned to the other side. The apparent testimony of Steven Almond, the survivor of the three Pagans who were beaten, describes his being hit in the back of the head by a rifle butt, when he entered the structure where Kish and Farless were tied, and the subsequent beatings.[6] He identified Stokes as being present and hitting the three men in the back of the head with a rifle butt. When he exited the van, Almond testified that Farless was still alive, but that he could elicit no response from Kish. Almond did not see Kish and Farless again.
 
 
 13
 The jury convicted Stokes, and subsequently recommended life imprisonment. The trial judge rejected this recommendation and imposed two death sentences on Stokes. On direct appeal, Stokes argued that his statement used at trial was an involuntary confession. In affirming the convictions, the Florida Supreme Court found that the confession "was the product of a knowing and voluntary waiver" and that "[t]here was no atmosphere of coercion surrounding his confession." Stokes v. State, 403 So.2d 377, 378 (Fla.1981) (per curiam). The Florida Supreme Court, however, vacated Stokes's death sentences and instructed the trial court to resentence him to life imprisonment without parole for twenty-five years on each count.[7] Id.
 
 
 14
 On January 25, 1984, Stokes filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in federal district court for the Middle District of Florida. His petition asserted that his statement was introduced against him at trial in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. After requiring respondents to answer Stokes's petition, the district court referred the case to a magistrate.
 
 
 15
 On March 31, 1986, the magistrate entered his report and recommendation that Stokes's petition be denied. The magistrate found that the two grounds Stokes raised for relief, that his confession was obtained after he invoked his right to counsel and that his confession resulted from psychological coercion, were addressed by the trial court and the Florida Supreme Court, and decided adversely to Stokes. The magistrate then concluded that these findings were entitled to a presumption of correctness and that there was ample support for them in the record.
 
 
 16
 Stokes, who intermittently has represented himself pro se in this case, timely filed his objections to the magistrate's report and recommendation on April 7, 1986. Two days later, April 9, 1986, the district judge noted in handwriting on the first page of the report and recommendation, "Approved." R2-18-1. Apparently not realizing that the district court intended the notation to be a final order, Stokes filed his amended objections to the report and recommendation on April 10, 1986, and continued to file documents, including address changes and supplemental authority, with the district court. On February 24, 1988, the district court denied Stokes's motion to set aside and vacate the judgment under Rule 60(b) of the Federal Rules of Civil Procedure, and found the motion to have been filed outside the time for filing a timely notice of appeal. The district court also subsequently denied Stokes's motions for a certificate of probable cause and for leave to proceed in forma pauperis. Thereafter, this court granted these motions by Stokes.
 
 
 17
 Stokes then appealed to this court the district court's denial of his motion to set aside and vacate the judgment denying his petition for habeas corpus relief. Rather than addressing Stokes's contention that the district court erred in concluding that his confession was not taken in violation of his right to counsel, this court determined that the district court had abused its discretion in denying Stokes's Rule 60(b) motion for relief from the judgment because no separate judgment had been filed. Stokes v. Dugger, No. 88-3197, 867 F.2d 1429 (table) (11th Cir. Jan. 23, 1989). This court reversed, remanded and directed the district court to enter a valid final judgment.
 
 
 18
 On February 22, 1989, a form judgment was entered with a single, additional statement ordering that "in accordance with the opinion of the Eleventh Circuit Court of Appeals, petitioner Durham Eldon Stokes take nothing and the action be dismissed." R2-34. The form judgment is signed by a deputy clerk, not the district judge. Stokes appealed from that final judgment and filed another motion to vacate the final judgment. The district court denied Stokes's Rule 60(b) motion, granted his motion to proceed in forma pauperis, and denied his motion for a certificate of probable cause. Stokes also appealed that order by the district court.
 
 
 19
 This court consolidated in the present appeal Stokes's appeal from the final judgment and his appeal from the denial of his Rule 60(b) motion. Stokes has had counsel, appointed by this court, for submission of a supplemental brief and oral argument. We now address the merits of Stokes's claim that his confession was taken in violation of his constitutional rights.
 
 DISCUSSION
 
 20
 On habeas corpus review, this court must make its own determination of the voluntariness of a confession based upon an independent review of the record, rather than according the usual presumption of correctness to state court factual findings. Arizona v. Fulminante, --- U.S. ----, ----, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991) (plurality opinion); Towne v. Dugger, 899 F.2d 1104, 1106 (11th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990); see Miller v. Fenton, 474 U.S. 104, 112, 106 S.Ct. 445, 450-51, 88 L.Ed.2d 405 (1985) ("[T]he ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination."). "A confession is voluntary if under the totality of the circumstances it was the product of 'free and rational' choice." Paxton v. Jarvis, 735 F.2d 1306, 1308 (11th Cir.) (quoting United States v. Vera, 701 F.2d 1349, 1364 (11th Cir.1983)), cert. denied, 469 U.S. 935, 105 S.Ct. 335, 83 L.Ed.2d 271 (1984); see Schneckloth v. Bustamonte, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (The voluntariness of a confession is determined by the totality of the surrounding circumstances.). The Court considers the final decision regarding the voluntariness of a confession as having "a uniquely legal dimension" and as being "beyond the reach of § 2254(d)." Miller, 474 U.S. at 115, 116, 106 S.Ct. at 452. Therefore, the voluntariness of a confession is a legal conclusion to which the presumption of correctness does not attach.
 
 
 21
 In contrast, a presumption of correctness is accorded to factual findings of state trial and appellate courts following a hearing on the factual issues and an "adequate written indicia" of the factual determinations, "unless one of the conditions set forth in Section 2254(d)(1)-(7) is found to exist ... or unless the state-court determination is 'not fairly supported by the record.....' "[8] 28 U.S.C. § 2254(d); Hance v. Zant, 696 F.2d 940, 946 (11th Cir.) (quoting 28 U.S.C. § 2254(d)(8)), cert. denied, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), overruled on other grounds, Brooks v. Kemp, 762 F.2d 1383 (11th Cir.1985) (en banc), cert. denied, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986); see Endress v. Dugger, 880 F.2d 1244, 1247 (11th Cir.1989), cert. denied, 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 287 (1990) ("Section 2254(d) provides that state court factual determinations 'shall be presumed to be correct' in a federal habeas corpus proceeding unless one of the eight enumerated exceptions applies." (quoting 28 U.S.C. § 2254(d)). "If none of those seven conditions [a]re found to exist, or unless the habeas court concludes that the relevant state-court determination is not 'fairly supported by the record,' 'the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.' "[9] Sumner v. Mata, 449 U.S. 539, 550, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981) (Mata I ) (quoting 28 U.S.C. § 2254(d)(8)) (emphasis in original). Additionally, mixed questions of fact and law, like legal conclusions, are not accorded a presumption of correctness. Cuyler v. Sullivan, 446 U.S. 335, 341-42, 100 S.Ct. 1708, 1714-15, 64 L.Ed.2d 333 (1980).
 
 
 22
 "Of course, the federal courts are not necessarily bound by the state court's findings." Sumner v. Mata, 455 U.S. 591, 597, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam) (Mata II ). After independent review, this court did not give a state appellate court's factual determinations a presumption of correctness because the state appellate opinion "fail[ed] to include several legally significant facts," and thus these factual determinations were not "fairly supported by the record." Dickerson v. Alabama, 667 F.2d 1364, 1368 (11th Cir.) (citing Mata I ), cert. denied, 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982). "Factual issues involve 'what are termed basic, primary, or historical facts: facts "in the sense of a recital of external events and the credibility of their narrators...." ' " Hance, 696 F.2d at 946-47 (quoting Townsend v. Sain, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963) (quoting Brown v. Allen, 344 U.S. 443, 506, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953))). State-court factual findings which this court explicitly or implicitly has found to have been accorded a presumption of correctness appropriately are specific and well analyzed or documented by the state courts. See, e.g., White v. Wainwright, 809 F.2d 1478, 1481-82 (11th Cir.) (The district court deduced the requisite criminal intent or mens rea by recounting the detailed historical facts found by the Florida Supreme Court.), cert. denied, 483 U.S. 1044, 108 S.Ct. 20, 97 L.Ed.2d 807 (1987); Fitzpatrick v. Wainwright, 800 F.2d 1057, 1063 (11th Cir.1986) (Recognizing that waiver of the Sixth Amendment right to counsel is a mixed question of fact and law, this court reiterated sufficient transcript of the exchange between the trial judge and the habeas corpus petitioner to show that the petitioner understood the meaning of "indigency" in order to accord this "implicit finding" a presumption of correctness.); Peek v. Kemp, 784 F.2d 1479, 1483 (11th Cir.) (en banc) (This court concluded that the state court's explicit factual findings that a juror was physically and emotionally ill, that the foreman informed the trial judge that the juror was ill, and that the prosecution and defense agreed to the substitution of the first alternate were fairly supported by the record.), cert. denied, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986). Clearly, there is a significant distinction between legal conclusions, to which a presumption of correctness is not accorded, and historical facts, which are given a presumption of correctness unless they are within the excepted situations in section 2254(d), or are not fairly supported by the record.
 
 
 23
 Problematic to our record review in this case is the absence of the transcript of Stokes's initial appearance and the entire trial transcript as well as the incomplete transcription of the officers' interrogation of Stokes. The officers admitted their failure to record approximately ten minutes of conversation before questioning Stokes, during which time they discussed potential danger to Stokes's family, and a subsequent omission of Stokes's questioning because the tape had not been turned over for recording. These omissions make it impossible for any court to review precisely the conversation that occurred between Stokes and the interrogating officers before his questioning or the questions and answers that were deleted.
 
 
 24
 Following the suppression hearing, the state trial court in this case issued no written order or ruling. The terse per curiam opinion by the Florida Supreme Court devotes one paragraph to the voluntariness of Stokes's confession. With no recognition of omitted conversation before Stokes's confession and a subsequent deletion in the tape, the Florida Supreme Court inexplicably concludes that Stokes's confession resulted from a knowing and voluntary waiver, based upon his receiving Miranda warnings, and that his confession was not coerced. Stokes, 403 So.2d at 378. The federal magistrate deferred to the Florida Supreme Court's conclusion that Stokes's confession resulted from a knowing and voluntary waiver to which was accorded a presumption of correctness.[10] Recognizing that Stokes claimed that he requested counsel prior to the recording of his confession, the magistrate found the fact that Stokes was read his Miranda rights to be "ample support for the Florida Supreme Court's finding that Mr. Stokes waived his right to counsel." R2-18-7. Regarding Stokes's claim of coercion, the magistrate found that the transcript of the confession supported Sergeant Hager's denial of coercion. The coercion claimed by Stokes occurred prior to the recorded giving of Miranda rights and his confession. Therefore, the alleged coercion could not be supported by the transcript of the confession. Concluding that the state court had conducted "a full and fair hearing on these issues and factual findings were made," the magistrate advised the district court to deny Stokes's request for an evidentiary hearing.[11] Id. at 8.
 
 
 25
 This case is analogous to a habeas corpus case that this court remanded "for an evidentiary hearing at which petitioner will be given a chance to establish ... what he said, under all the circumstances...." Lamar v. Banks, 684 F.2d 714, 720 (11th Cir.1982). In Lamar, the trial transcript was not part of the record, the district court referred the federal habeas petition to a magistrate and adopted the magistrate's report recommending that habeas corpus relief be denied, and the district court did not conduct an evidentiary hearing. The Lamar petitioner also filed objections to the magistrate's report and recommendation.
 
 
 26
 In Lamar, this court determined that the lack of factual findings by the state trial court could not be overcome to satisfy the presumption of correctness standard by the state habeas court's legal conclusions, and that the missing transcript defied the conclusion that the record could fairly support the factual findings.
 
 
 27
 We are mindful of our duty to accord to the state courts' written findings of fact a presumption of correctness, unless one of the eight paragraphs of 28 U.S.C. § 2254(d) applies. See Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). We believe our direction that an evidentiary hearing be held on remand in this case comports with that duty for at least two reasons. First, there is no state-court finding of fact here that is "evidenced by a written finding, written opinion, or other reliable and adequate written indicia," as § 2254(d) requires in order for the presumption of correctness to arise in the first place.... Nor do we have ... a transcription of oral findings delivered from the bench. The state habeas court did file a written opinion, with most of which we are in agreement, but it is directed almost entirely to conclusions of law. A section of the opinion discusses and rejects petitioner's contention that the statute is unconstitutional as applied, but no finding is made that petitioner's words tended in fact under all the circumstances to provoke violence from the hearer. The state habeas court did say, citing Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), that "this court finds that there was sufficient evidence to justify the fact finder in this case finding the Defendant ... guilty beyond a reasonable doubt," R. 13, but we are at a loss to see what basis such a finding could have. Because of the absence of a transcript neither the state habeas court nor anyone else can ever know precisely what evidence the fact finder heard.....
 
 
 28
 Second, even if there were a written finding of fact that petitioner's words tended to provoke a resort to violence, we should have to hold that "such factual determination is not fairly supported by the record," 28 U.S.C. § 2254(d), simply because there is no record in the sense of testimony about the crucial facts. "Ordinarily such a record--including the transcript of testimony (or if unavailable some adequate substitute, such as a narrative record), the pleadings, court opinions, and other pertinent documents--is indispensable to determining whether the habeas applicant received a full and fair state-court evidentiary hearing resulting in reliable findings [citations omitted]. Of course, if because no record can be obtained the district judge has no way of determining whether a full and fair hearing which resulted in findings of relevant fact was vouchsafed, he must hold one." Townsend v. Sain, 372 U.S. 293, 319, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963). Townsend was decided before the latest revision of § 2254(d), but the statute as presently written does not differ from the rule of Townsend in any respect directly relevant to this case. It necessarily remains true that a finding of fact (assuming there is one) cannot be said to be fairly supported by the record when there is no record....
 
 
 29
 Id. (emphasis added). Similarly, we have determined that the legal conclusions of the Florida Supreme Court and the critical transcript omissions of the confession and the entire trial in this case preclude our according a presumption of correctness to any explicit or implicit underlying factual findings by the state courts. We conclude that several of the exceptions to section 2254(d) appear to be applicable and that the state-court findings, which constitute legal conclusions, are not fairly supported by the record.
 
 
 30
 Moreover, this court has held that "[w]henever any party files a timely and specific objection to a finding of fact by a magistrate, the district court has an obligation to conduct a de novo review of the record with respect to that factual issue." LoConte v. Dugger, 847 F.2d 745, 750 (11th Cir.), cert. denied, 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); see 28 U.S.C. § 636(b)(1)(B) (When a party timely has filed written objections to a magistrate's proposed findings and recommendations, "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." (emphasis added)). Stokes filed a timely objection to the magistrate's report and recommendation explicitly stating that he was interrogated and threatened by the interrogating officers after he requested to see his counsel. He contends that the magistrate's conclusion that he had a full and fair hearing on his claims is erroneous.
 
 
 31
 The district court failed to accord a de novo review of the magistrate's factual findings to which Stokes objected. "[A]n appellate court must be satisfied that a district judge has exercised his non-delegable authority by considering the actual testimony, and not merely by reviewing the magistrate's report and recommendations." United States v. Elsoffer, 644 F.2d 357, 359 (5th Cir. Unit B Apr.1981) (per curiam); see Hernandez v. Estelle, 711 F.2d 619, 620 (5th Cir.1983) (per curiam) ("The magistrate's findings are persuasive and well-documented; however, the statutory obligation of the district court to arrive at its own, independent conclusion about those portions of the magistrate's report to which objection is made is not satisfied by a mere review of the magistrate's report itself.").
 
 
 32
 Additionally, the district court did not further review Stokes's factual contentions following this court's remand, stressing the importance of the circumstances of Stokes's confession to the merits of his petition for habeas corpus relief. Instead, the district court apparently directed the entry of a form judgment, unsigned by the district judge. This is insufficient compliance with a district court's mandatory de novo review of timely objections to a magistrate's report and recommendation and this court's subsequent description of the constitutional problems to be analyzed, given the circumstances of Stokes's confession.
 
 
 33
 Although the record omissions are remediable by supplementing the record on remand, our overriding concern is with the constitutionality of Stokes's confession. Reversing the district's court's denial of Stokes's first Rule 60(b) motion, another panel of this court recognized the significance of the circumstances surrounding his confession:
 
 
 34
 Sometime after his initial appearance in court, but prior to consulting with counsel, two law enforcement officers of the Sumter County Sheriff's Department, interrogated Stokes. During the course of the interrogation, Stokes admitted his involvement in the murders. Although the officers recorded and transcribed this interrogation, Stokes contends that the recorder was not on at all times during questioning, and asserts that prior to the recorder being turned on, he requested an opportunity to speak to his attorney. According to Stokes, the officers refused his request. Stokes claims that his confession was coerced through fear of reprisals against his family by members of the Outlaws Motorcycle Gang. These circumstances surrounding Stokes's pretrial confession are relevant to the merits of his petition for habeas corpus relief.
 
 
 35
 Stokes v. Dugger, No. 88-3197 at 2, 867 F.2d 1429 (table) (11th Cir. Jan. 23, 1989) (emphasis added).
 
 
 36
 The determinative issue in this case is whether Stokes's confession was obtained constitutionally. Neither the state courts nor the federal district court analyzed the constitutionality of Stokes's confession under the relevant law, notwithstanding Stokes's repeated citation of pertinent cases. "[A]bsent a valid waiver, the defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches." Moran v. Burbine, 475 U.S. 412, 428, 106 S.Ct. 1135, 1145, 89 L.Ed.2d 410 (1986); see Brewer v. Williams, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) ("Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been instituted against him...."); Kirby v. Illinois, 406 U.S. 682, 688, 689, 92 S.Ct. 1877, 1881, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion) ("[I]t has been firmly established" that the right to counsel, guaranteed by the Sixth and Fourteenth Amendments, attaches at the commencement of adversary judicial proceedings, defined as "formal charge, preliminary hearing, indictment, information, or arraignment."); Little v. City of North Miami, 805 F.2d 962, 968 (11th Cir.1986) (per curiam) ("The Supreme Court has emphatically ruled that the Sixth Amendment is not implicated until adversarial judicial proceedings have been initiated."). The Court also has recognized not only that "[t]he Sixth Amendment right to counsel attaches at the first formal proceeding against an accused," but also that "in most States, at least with respect to serious offenses, free counsel is made available at that time and ordinarily requested." McNeil v. Wisconsin, --- U.S. ----, ----, 111 S.Ct. 2204, 2210, 115 L.Ed.2d 158 (1991); see Fla.R.Crim.P. 3.130(c)(1) (requiring appointment of counsel no later than the initial appearance, if the defendant is eligible).
 
 
 37
 "By its very terms," the Sixth Amendment "becomes applicable only when the government's role shifts from investigation to accusation." Moran, 475 U.S. at 430, 106 S.Ct. at 1146; see United States v. Gouveia, 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984) (The Sixth Amendment protects "the unaided layman" at the initiation of adversary proceedings, when " 'the government has committed itself to prosecute, and ... the adverse positions of government and defendant have solidified,' " with the defendant finding " 'himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' " (quoting Kirby, 406 U.S. at 689, 92 S.Ct. at 1882)). "Once the right to counsel has attached and been asserted, the State must of course honor it," imposing upon the state "an affirmative obligation to respect and preserve the accused's choice to seek this assistance." Maine v. Moulton, 474 U.S. 159, 170-71, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985). "[T]he Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." 474 U.S. at 176, 106 S.Ct. at 487; see Estelle v. Smith, 451 U.S. 454, 471, 101 S.Ct. 1866, 1877, 68 L.Ed.2d 359 (1981) (Following initial proceedings, the habeas corpus petitioner was denied his Sixth Amendment right to counsel, when defense counsel "were not notified in advance that the [court-ordered competency] psychiatric examination would encompass the issue of their client's future dangerousness, and respondent was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." (footnote omitted)).
 
 
 38
 While an individual may waive the Sixth Amendment right to counsel, "federal courts should refrain from casually finding waiver of vital federal constitutional guarantees, such as the right to counsel...." United States v. Garcia, 517 F.2d 272, 277 (5th Cir.1975). The Supreme Court has explained "that the right to counsel does not depend upon a request by the defendant, and that courts indulge in every reasonable presumption against waiver." Brewer, 430 U.S. at 404, 97 S.Ct. at 1242 (citations omitted); see Smith v. Wainwright, 777 F.2d 609, 619 (11th Cir.1985) ("It is important to note that [the habeas corpus petitioner's] sixth amendment right to counsel did not depend upon his requesting that an attorney be present."). "[A]s a matter of federal constitutional law," the state must prove " 'an intentional relinquishment or abandonment of a known right or privilege.' " Brewer, 430 U.S. at 404, 97 S.Ct. at 1242 (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). A waiver of the Sixth Amendment right to counsel must be "voluntary, knowing and intelligent," with the determination of voluntariness dependent "on the particular facts and circumstances of each case." Garcia, 517 F.2d at 277; see Moran, 475 U.S. at 421, 106 S.Ct. at 1141 (The voluntary, knowing and intelligent waiver of the right to counsel has "two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." (citations omitted)). A defendant's waiver of the Sixth Amendment right to counsel must be established by " 'clear, unequivocal, and unambiguous language.' " Garcia, 517 F.2d at 278 (quoting National Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311, 332, 84 S.Ct. 411, 423, 11 L.Ed.2d 354 (1964)). Because "the very foundation of our system of justice" is implicated, "the proposition that unless an accused has intelligently and effectively waived the right to counsel, the Sixth Amendment 'stands as a jurisdictional bar to a valid conviction and sentence depriving him of his life or his liberty.' " Boruff v. United States, 310 F.2d 918, 920 (5th Cir.1962) (quoting Johnson, 304 U.S. at 468, 58 S.Ct. at 1024); see Wall v. Purdy, 465 F.2d 933, 933 (5th Cir.1972) (per curiam) ("If there was no valid waiver of appellant's Sixth Amendment right to counsel, then he is entitled either to have his conviction and sentence of imprisonment set aside or, if the respondent should desire[,] to [be] retr[ied] for the offense....").
 
 
 39
 In Brewer, the Court analyzed the Sixth Amendment waiver of counsel in a confession case, which is analogous to this case. Following his arraignment for the murder of a young girl, the habeas corpus petitioner Williams was transported by police detectives approximately 160 miles to the city, where he was to consult with his attorney. During the trip, one of the policemen gave Williams Miranda warnings and, subsequently, appealed to his religious inclination by asking Williams to show the policemen where he had disposed of the little girl's body so that her parents could give her a Christian burial. Consequently, Williams directed the policemen to the child's body.
 
 
 40
 Determining that Williams was entitled to a new trial for the violation of his Sixth Amendment right to counsel, the Court reasoned that judicial proceedings had been instituted against him, that the detective "deliberately and designedly" elicited incriminating information from Williams while he was isolated from his counsel, and that the detective was "fully aware" that Williams was represented by counsel. Brewer, 430 U.S. at 399, 97 S.Ct. at 1239. Additionally, Williams had indicated that he wanted to talk to his attorney before talking to the police. As the district court and Eighth Circuit had determined, the Supreme Court concluded that the detective's knowledge of Williams's religious beliefs and use of that psychological approach to obtain incriminating information, despite Miranda warnings, did not meet the state's heavy burden of showing a knowing and intelligent waiver of Sixth Amendment rights. 430 U.S. at 403, 97 S.Ct. at 1241-42. Advising the application of constitutional principles to the facts of each case, the Court decided that the circumstances of the confession did not establish that Williams had waived his right to counsel under the Sixth Amendment: "It is true that Williams had been informed of and appeared to understand his right to counsel. But waiver requires not merely comprehension but relinquishment.... [U]nder the circumstances of this case, Williams could not, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments."[12] 430 U.S. at 404, 405-06, 97 S.Ct. at 1242, 1243 (footnote omitted) (emphasis in original). Citing Brewer, this court additionally has concluded that an exchange of the right to counsel for an agreement by the government beneficial to the defendant "constitute[s] a coerced rather than voluntary waiver of the [defendant's] sixth amendment rights, and as such [i]s wholly improper." United States v. Bascaro, 742 F.2d 1335, 1356 (11th Cir.1984), cert. denied, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613, 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985).
 
 
 41
 It is uncontroverted that Stokes was appointed counsel at his initial appearance, that he was interrogated immediately after his initial appearance before he had the opportunity to meet or consult with his attorney, that the interrogation was initiated by the investigating officers, that the safety of his family was discussed, that he subsequently was given Miranda warnings, and that he made incriminating statements during the questioning. The parties do dispute whether Stokes requested counsel at his initial appearance.[13] Obviously, the transcript of the initial appearance would resolve this disagreement. Tending to substantiate Stokes's representation that he requested counsel at his initial appearance is the record inclusion of his motion to have the initial appearance transcribed and the trial court's order granting his motion; the transcript, however, is not part of the record.
 
 
 42
 We consider the parties' dispute concerning Stokes's request for counsel at his initial appearance to be a distinction without a difference. The officers concede that they were aware that Stokes was brought to them for interrogation directly from his initial appearance, where, at this critical stage of the prosecution, he would have been appointed counsel. Irrespective of Stokes's request for an attorney, he had appointed counsel, which knowledge was imputed to the investigating officers.[14]
 
 
 43
 As the detective in Brewer appealed to Williams's religious beliefs to obtain his confession, the investigating officers in this case could have elicited Stokes's confession by preliminarily discussing his acknowledged preeminent concern: the safety of his family, confronted with potential gang retribution. Furthermore, Stokes was arrested, transported from Arkansas, and arrived in Orange County the night before his initial appearance. He was taken directly from his initial appearance to an interrogation room. It is feasible that Stokes was tired in addition to his being concerned about the safety of his family. The interrogating officers, who admittedly informed no one, including the public defender's office before interrogating Stokes, were in a position to use Stokes's vulnerabilities of possible exhaustion and fear for his family's safety to their advantage. Whether they did so remains for determination by the district court following an evidentiary hearing. The officers conceded that they did not record their preliminary conversation with Stokes, and that they did discuss the safety of his family during that time. Stokes testified that his interpretation of the officers' remarks was that his family would be safe if he confessed.
 
 
 44
 Although the record of Stokes's interrogation is incomplete, the known circumstances involved in his confession indicate that his testimony regarding the officers' psychologically coercive comments facially is not unreasonable. "Our cases have made clear that a finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient. As we have said, 'coercion can be mental as well as physical.' " Fulminante, --- U.S. at ----, 111 S.Ct. at 1252-53 (footnote omitted) (quoting Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960)); see Edwards v. Arizona, 451 U.S. 477, 484 n. 8, 101 S.Ct. 1880, 1885 n. 8, 68 L.Ed.2d 378 (1981) (The Court has admonished "that a valid waiver of counsel rights should not be inferred from the mere response by the accused to overt or more subtle forms of interrogation or other efforts to elicit incriminating information." (citing Brewer, 430 U.S. 387, 97 S.Ct. 1232; Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964))); Martin v. Kemp, 760 F.2d 1244 (11th Cir.1985) (per curiam) (This court reversed the district court's denial of habeas corpus relief to a petitioner who testified that he confessed and also pled guilty to a burglary to protect his pregnant wife from the investigator's threats of prosecution.).
 
 
 45
 While it is impossible for any court to review exactly what was said during the portions of the taped confession when the tape was not recording, the district court at an evidentiary hearing can listen to Stokes and the investigating officers' testimony regarding the controversial preliminary conversation and make a credibility assessment. The district court should explain its reasons for accepting or rejecting the testimony of Stokes and the two officers. The state and federal courts have not analyzed adequately the factual findings in this case for appropriate review. Specifically, there is a critical factual dispute with significant legal implications regarding what was said during the ten-minute discussion between Stokes and the investigating officers before Miranda warnings were administered.
 
 
 46
 After hearing all of the testimony, it is essential that the district court make specific, documented factual findings concerning any coercive techniques allegedly employed to induce Stokes to confess under a totality of circumstances and Brewer analysis. Using the appropriate constitutional law, we expect the district court to make a legal conclusion, based on its factual findings, as to whether Stokes gave his statement in derogation of his Sixth Amendment right to counsel because he felt coerced to confess. If the circumstances under which Stokes confessed appear similar to the situation in Brewer, then despite Miranda warnings, the voluntariness of Stokes's confession could be tainted by the purported psychologically coercive atmosphere in which he responded to the officers' questioning. Consequently, the alleged waiver of his Sixth Amendment right to counsel would be invalidated. See McNeil, --- U.S. at ----, 111 S.Ct. at 2209 ("[T]he relevant question was not whether the Miranda "Fifth Amendment" right had been asserted, but whether the Sixth Amendment right to counsel had been waived." (emphasis in original)).
 
 
 47
 If Stokes did not constitutionally waive his Sixth Amendment right to counsel before he confessed to the officers, then his confession improperly was admitted into evidence at his trial, resulting in his conviction.[15] We fully appreciate the need for diligent police investigation for the resolution of crimes, but, as the Brewer court observed,
 
 
 48
 "[d]isinterested zeal for the public good does not assure either wisdom or right in the methods it pursues." Haley v. Ohio, 332 U.S. 596, 605[, 68 S.Ct. 302, 306, 92 L.Ed. 224 (1948) ] (Frankfurter, J., concurring in judgment). Although we do not lightly affirm the issuance of a writ of habeas corpus in this case, so clear a violation of the Sixth and Fourteenth Amendments as here occurred cannot be condoned. The pressures on state executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder.... But it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all.
 
 
 49
 Brewer, 430 U.S. at 406, 97 S.Ct. at 1243; see Harvey, 494 U.S. at 351, 110 S.Ct. at 1180 ("The prosecution must not be allowed to build its case against a criminal defendant with evidence acquired in contravention of constitutional guarantees and their corresponding judicially-created protections.").
 
 
 50
 "We may not affirm a district court's denial of a writ of habeas corpus unless the court either held a hearing, or the record shows that the district court independently reviewed the relevant portions of the state court record." Lincoln v. Sunn, 807 F.2d 805, 808 (9th Cir.1987). Neither of these responsibilities was undertaken by the district court in this case. Accordingly, the district court's denial of Stokes's habeas corpus petition is REVERSED, and the case is REMANDED for an evidentiary hearing addressing the factual and constitutional concerns that we have explained herein. The record shall be expanded to include the transcript of Stokes's initial appearance and his entire trial transcript. Given our ruling, Stokes's appeal from the district court's denial of his second Rule 60(b) motion is MOOT.
 
 COX, Circuit Judge, specially concurring:
 
 51
 I concur in the result.
 
 
 
 *
 Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 The information is not part of the appellate record in this case. In his initial pro se brief, Stokes states that the information charges were false imprisonment and robbery of Kish and Farless. The petitioner's supplemental brief, filed by his court-appointed attorney, as well as the state's briefs indicate that the information charges for which Stokes was arrested were for the murders of the two men. As we discuss in note 14, even assuming that the information charges were false imprisonment and robbery, Stokes's statement may be precluded on Sixth Amendment grounds. Although we cannot verify the charges in the information, there is no question in this case that Stokes was sought in connection with his participation in the murders of the two men
 
 
 [2]
 Although Stokes's motion to transcribe the initial appearance proceedings and the trial judge's order granting his motion are included in the record, the transcript of Stokes's initial appearance is noticeably absent. While the parties disagree as to whether Stokes requested counsel at the initial appearance, they do not dispute the trial court's appointing the public defender to represent him. We find the fact that Stokes was appointed counsel at his initial appearance to be sufficient for deciding the issue before us in this habeas corpus petition. Nevertheless, on remand, the record shall be expanded to include the transcript of Stokes's initial appearance for subsequent proceedings in this case
 
 
 [3]
 On cross examination at the suppression hearing, Stokes testified regarding the officers' alleged coercion that "[t]hey were making it sound if I didn't go along with the statement they didn't give a damn about what happened to my family." R1-14-App.-15
 
 
 [4]
 The trial judge stated at the conclusion of the suppression hearing that he wanted to read the cases given to him by counsel because he did not want "to summarily rule" on the suppression motion, and acknowledged that his delay in ruling might be inconvenient for counsel faced with the impending trial date. R1-14-46. Nevertheless, the trial judge did not enter a written order or ruling on the motion, and the confession was admitted at trial. The portion of the trial transcript included in the record shows that the court had directed that some of Stokes's statement not be played for the jury. There is no indication of where in the statement the deletion was made. Regarding the playing of the taped confession at trial, Stokes's counsel stated that he readopted previous motions concerning the confession and the trial judge responded that his ruling would be same
 
 
 [5]
 The record in this case contains only excerpts from the trial transcript, generally with no indication of the identity of the witness testifying, and no trial exhibits. On remand, the record shall be supplemented to include the entire trial transcript
 
 
 [6]
 Almond testified against Stokes, but the Outlaws leader, who ordered the killings, received immunity for his cooperation concerning a number of homicides. The Outlaws member, who drove the van in which the three Pagan members were transported for disposal, became a witness for the state and was allowed to plead to lesser offenses in return for extensive testimony regarding the activities of the Outlaws in Florida
 
 
 [7]
 The Florida Supreme Court overturned Stokes's death sentences because it found mitigation under Florida law in Stokes's "lack of any significant history of prior criminal activity," and the apparently reasonable consideration by the jury that the Outlaws leader had received immunity from prosecution for his role in the subject deaths. Stokes, 403 So.2d at 378
 
 
 [8]
 The following exceptions to the presumption of correctness accorded to state court factual findings appear to be present in this case: the presumption of correctness is inapplicable if "the merits of the factual dispute were not resolved in the State court hearing," "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing," "the material facts were not adequately developed at the State court hearing," the petitioner "did not receive a full, fair, and adequate hearing in the State court proceeding," the petitioner otherwise was "denied due process of law in the State court proceeding," or the federal court concludes that the state court's "factual determination is not fairly supported by the record." 28 U.S.C. § 2254(d)(1), (2), (3), (6), (7), (8); see Fike v. James, 833 F.2d 1503, 1506 (11th Cir.1987) (per curiam) (While this court has observed that the Court in Miller did not decide whether a federal habeas court must accord a presumption of correctness to state court factual findings regarding the validity of a waiver, it recognized that, for a presumption of correctness to accrue, the state court factual findings must be supported fairly in the record and none of the exceptional circumstances in section 2254(d) can be applicable.)
 
 
 [9]
 In Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (Mata I ), the Court faulted the Ninth Circuit for disagreeing with the state-court factual findings, accepted by the district court, and granting relief in that habeas corpus case on an issue not raised on direct appeal without explaining the reasoning for concluding that the factual findings came within the exceptions of section 2254(d)(1)-(7) or were not fairly supported by the record in accordance with section 2254(d)(8). In remanding the case, the Court was careful to state that it was not expressing an opinion regarding the Ninth Circuit's conclusion on the merits, but that in order to avoid the presumption of correctness generally given to state-court factual findings, the federal habeas court must explain the reasoning leading it to conclude that any of the seven exceptional situations were present or that the state factual findings were not fairly supported by the record. 449 U.S. at 551, 552, 101 S.Ct. at 771. Following remand and the Ninth Circuit's adherence to its original opinion on the merits, also without the appropriate section 2254(d)(1)-(8) analysis as instructed by the Court in Mata I, the Court remanded the case again for the requisite analysis and stressed:
 Section 2254(d) permits a federal court to conclude, for example, that a state finding was "not fairly supported by the record." But the statute does require the federal courts to face up to any disagreement as to the facts and to defer to the state court unless one of the factors in § 2254(d) is found.
 Sumner v. Mata, 455 U.S. 591, 597-98, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam) (Mata II ). In this case, we have sought to abide by the Court's admonition in Mata I and Mata II by providing a detailed explanation of our disagreement with the state-court factual findings or the failure of the state courts to find legally significant facts and with the district court's making legal conclusions that are not fairly supported by the record.
 
 
 [10]
 The magistrate's report and recommendation states:
 Though the trial court neglected to make any specific findings of fact or enter any written order on the Motion to Suppress, the Petitioner's confession was admitted into evidence over objection at his trial. On appeal to the Florida Supreme Court the Court found on review of the record that Mr. Stokes' confession was the product of a knowing and voluntary waiver and not the product of coercion by agents of the State.
 ....
 On appeal the record was reviewed by the Florida Supreme Court and factual findings, adverse to the Petitioner, resulted. Specifically, the Florida Supreme Court found that the Petitioner voluntarily waived his right to counsel during questioning and that his confession was not the product of coercion by the State.
 It is well settled that findings of historical fact by State Appellate Courts are entitled to a presumption of correctness in habeas proceedings.
 R2-18-5-6 (citations omitted).
 
 
 [11]
 We are cognizant that "the district court can find material facts implied in a state court opinion where the following two conditions are met: (1) the state court has decided petitioner's constitutional claim on the merits; (2) the state court's view of the facts is plain from the opinion or other indicia." Demps v. Wainwright, 805 F.2d 1426, 1434 (11th Cir.1986), cert. denied, 484 U.S. 873, 108 S.Ct. 209, 98 L.Ed.2d 160 (1987). We have determined, however, that the magistrate's report and recommendation, adopted by the district court, meets neither of these requirements. First, the Florida Supreme Court improperly analyzed this case under the Fifth Amendment instead of the Sixth Amendment, which we have found governs Stokes's claims. Second, the Florida Supreme Court's opinion does not discuss its factual findings, but states legal conclusions, which are not entitled to a presumption of correctness
 
 
 [12]
 "In Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), the Court established a prophylactic rule that once a criminal defendant invokes his Sixth Amendment right to counsel, a subsequent waiver of that right--even if voluntary, knowing, and intelligent under traditional standards--is presumed invalid if secured pursuant to police-initiated conversation." Michigan v. Harvey, 494 U.S. 344, 110 S.Ct. 1176, 1177, 108 L.Ed.2d 293 (1990). Jackson established a "bright-line rule" for determining whether a defendant has waived his Sixth Amendment right to counsel and a "new rule" of constitutional criminal procedure under Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Harvey, 494 U.S. at 345, 110 S.Ct. at 1179; Collins v. Zant, 892 F.2d 1502, 1511 (11th Cir.) (per curiam), cert. denied, --- U.S. ----, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990); see Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Applying the Teague analysis, this court has determined that Jackson should not be applied retroactively to collateral attacks, when the statement at issue was used to obtain the defendant's conviction. Collins, 892 F.2d at 1512. Therefore, Jackson does not apply to this case because Stokes's conviction became final before Jackson was decided. Without Jackson, we must determine whether Stokes's alleged waiver of his right to counsel was "voluntary, knowing, and intelligent under the traditional case-by-case inquiry called for by Brewer v. Williams." Harvey, 494 U.S. at 349, 110 S.Ct. at 1179-80
 
 
 [13]
 Stokes claims that he requested counsel at his initial appearance. Appellant's Initial Brief at 23, 25. Respondents contend that the trial judge's giving Stokes a card with information enabling him to contact the public defender's office is "not quite the equivalent of asking for counsel." Appellee's Initial Brief at 8
 
 
 [14]
 The Supreme Court has held that "Sixth Amendment principles require that we impute the State's knowledge from one state actor to another. For the Sixth Amendment concerns the confrontation between the State and the individual. One set of state actors (the police) may not claim ignorance of defendants' unequivocal request for counsel to another state actor (the court)." Jackson, 475 U.S. at 634, 106 S.Ct. at 1410 (footnote omitted); see Cervi v. Kemp, 855 F.2d 702, 706 & n. 10 (11th Cir.1988) (imputing knowledge to a Georgia Bureau of Investigation interrogator that the accused had requested counsel at his initial proceeding before a magistrate), cert. denied, 489 U.S. 1033, 109 S.Ct. 1172, 103 L.Ed.2d 230 (1989)
 
 
 [15]
 Before a federal court can determine that the admission of a coerced confession is harmless error, it must review the record de novo to determine "whether the State has met its burden of demonstrating that the admission of the confession ... did not contribute to ... [the] conviction." Fulminante, --- U.S. at ----, 111 S.Ct. at 1257. In the absence of the entire interrogation and trial transcripts, we cannot determine harmless error. We note, however, that admission of Stokes's inculpatory statement at trial appears to have been critical to his conviction